# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# IN THE WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:23-cr-20072-JTF-tmp |
| ) | |
| **JAMIE CRUZ and JORGE CRUZ,** ) | |
| ) | |
| Defendants. ) | |

### ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION; GRANTING DEFENDANTS' MOTIONS TO SUPPRESS.

Before the Court is Defendant Jamie Cruz's Motion to Suppress, filed on September 26, 2023. (ECF No. 41.) On September 26, 2023, Codefendant Jorge Cruz joined the Motion to Suppress. (ECF No. 45.) The motion was referred to Chief Magistrate Judge Tu M. Pham on September 27, 2023. (ECF No. 49.) The United States filed its Responses in opposition on October 10, 2023. (ECF Nos. 51 & 52.) On January 4, 2023, an evidentiary hearing was held. (ECF No. 81.) Thereafter, the Chief Magistrate Judge entered his Report and Recommendation ("R&R") on May 7, 2024, recommending that the motion to suppress be granted. (ECF No. 88.) On June 3, 2024, the United States filed Objections to the R&R, to which Defendants responded on July 5, 2024. (ECF Nos. 96, 101.) For the reasons provided herein, the Court **ADOPTS** the Chief Magistrate Judge's Report and Recommendation and **GRANTS** Defendants' Motions to Suppress.

## I.     **FINDINGS OF FACTS**

In the R&R, the Magistrate Judge sets forth proposed findings of fact; none of the parties objected to those findings.[1] (ECF Nos. 96, 6 & 101, 3.) After a careful review of the record and exhibits, the Court **ADOPTS** and **INCORPORATES** the Magistrate Judge's proposed findings of facts. These findings are summarized in relevant part below.

On April 23, 2023, West Tennessee Drug Task Force Agent Colby Burmeister, accompanied by Agent Troy Carter, pulled over a Nissan Sentra for violating Tennessee's Move Over Law. (ECF No. 89, 13.) Once the Sentra pulled over, Agent Burmeister walked to the passenger side of the vehicle and explained to the driver (later identified as Jamie Cruz) and the passenger (later identified as Jorge Cruz) that he stopped them because of the traffic violation and that he was going to be issuing a warning rather than a ticket. (ECF No. 95.)[2] (Ex. No. 1, Burmeister Video, 0:53–0:58.) Agent Burmeister then asked Jamie Cruz for his driver's license, proof of insurance, and vehicle registration. (*Id.* at 1:03–1:18.) Jamie Cruz informed Agent Burmeister that he did not have his registration in the vehicle and that his proof of insurance was on his cell phone. (*Id.* at 1:19–1:26.) At this point, Agent Burmeister asked Jamie Cruz to step out of the vehicle while he filed out a written warning. (*Id.* at 1:28–1:33.) (*See* Ex. No. 2, Traffic Courtesy Warning.) Agent Burmeister later testified that he decided to issue a written—instead of a verbal—warning due to the lack of insurance and registration.[3] (ECF No. 89, 78.) Jamie Cruz

---

[1] It appears that the parties have differing views on whether Jamie Cruz's third answer regarding his travel plans was offered as a response to Agent Burmeister's follow-up question (Defendant Jamie Cruz's position) or offered as an additional explanation after being initially withheld (the Government's position). The Government characterized the third response as "the itinerary went from 'just visiting' and 'just driving around,' which are non-specific plans, to later the more specific plan of visiting Lucas Stadium. However, the more specific information was not initially offered." (ECF No. 96, 6.)

[2] The Court refers to the Exhibits hereinafter as they have been identified in the Exhibit and Witness List.

[3] Agent Burmeister testified that there was no state law mandating the written warning and that issuing it was within the officer's discretion. (ECF No. 89, 75–76.)

2

exited the Sentra and went with Agent Burmeister back to the police vehicle, and Jorge Cruz remained in the car. (Ex. No. 1, Burmeister Video, 1:43–1:50.) While standing in front of the police vehicle, Agent Burmeister asked Jamie Cruz questions about his travel itinerary, to which Cruz responded that he was heading back to Dallas after visiting Indianapolis, Indiana. (*Id.* at 1:55–2:33.) Agent Burmeister next asked what they were doing in Indianapolis and Cruz explained that they were "just visiting" and "just driving around" after he lost his job. (*Id.* at 2:53–3:05.) While filling out the form, Agent Burmeister again asked to see Cruz's proof of insurance and allowed Cruz to walk back to his car to retrieve his phone to access his insurance information. (*Id.* at 3:21–3:27.) Cruz returned to the police vehicle and told Agent Burmeister that he had no cell phone service to pull up the insurance information. (*Id.* at 3:51–3:55.) Agent Burmeister then asked Cruz questions about the duration of his car ownership, his Irving address, the identity of the passenger in his car, and about his occupation. (*Id.* at 4:25–5:08.) Cruz responded that he had recently lost his job at UPS due to high blood pressure. (*Id.*) Following this, Agent Burmeister asked Cruz how long they were in Indianapolis, and Cruz answered that they were just visiting for the weekend. (*Id.* at 5:18–5:22.) When asked again why they had visited Indianapolis, Cruz explained that his "daughter's cousin's dad" recommended that he visit "Lucas Stadium" in Indianapolis and that the trip was "spur of the moment" without a "set destination." (*Id.* at 5:24–5:54.) He stated that he was thinking about going to Florida next. (*Id.* at 5:57–6:02.) At the suppression hearing, Agent Burmeister stated that he found Cruz's third answer to be suspicious because this information was not offered initially, was more detailed than previous answers, how family was not mentioned earlier, and how Cruz characterized the familial relationship as "daughter's cousin's dad." (ECF No. 89, 19, 53.) He also later testified that he found it suspicious that Cruz was unemployed but taking a long road trip. (*Id.* at 35.)

As he was finishing up the warning form, Agent Burmeister told Cruz, "Man this is just a warning, no court costs, no fines, you can uh hang it up, frame it in your house, or throw it away, up to you." (Ex. No. 1, Burmeister Video, 6:14–6:25.) At this time, the only incomplete space on the form was a line for the recipient's signature.[4] (*Id.* at 6:32.) (*See* Ex. No. 2, Traffic Courtesy Warning.) Agent Burmeister then asked Cruz if there were any drugs, large amounts of currency, hidden compartments, or weapons in the vehicle. (Ex. No. 1, Burmeister Video, 6:32–6:61.) When Cruz denied having any of those items in the vehicle, Agent Burmeister next asked him for consent to search the vehicle. (*Id.* at 6:51–7:04.) Agent Burmeister testified that Cruz's body language and nervousness when this line of questioning began aroused his suspicion. (ECF No. 89, 22, 69.)

After Cruz declined to consent, Agent Burmeister informed him that he would be conducting a K-9 drug sniff. (Ex. No. 1, Burmeister Video, 7:04–7:15.) Agent Burmeister then called Agent Caleb Burton to "come down and run his dog" on exterior of the vehicle. (*Id.* at 7:31–7:40; and ECF No. 89, 23.) After this, Agent Burmeister called Blue Light Operations Center ("BLOC") to begin running a check on Cruz's information.[5] (*Id.* at 8:20.) Thereafter he patted down both Jamie Cruz and Jorge Cruz. (*Id.* at 9:00–9:35.) Agent Burmeister then returned to his phone to continue providing information to BLOC to help them complete the background check. (*Id.* at 9:44–11:04.) During the time that Agent Burmeister was on the phone, Agent Burton arrived on the scene and had his dog "work" the exterior of the car, which yielded a positive alert. (*Id.* at 9:39–10:28.) Agent Burmeister let the Cruzes know about the positive alert and again asked if

---

[4] Agent Burmeister testified that he usually had drivers sign the Traffic Courtesy Warning form once he had called BLOC and run the information, warrants check, and a check on the vehicle. (ECF No. 89, 19.)

[5] At the Motion to Suppress hearing, counsel for Jamie Cruz asked Agent Burmeister whether Agent Carter could have called BLOC during the stop and Agent Burmeister responded that an officer must have an identification number from their supervisory department to run a records check with BLOC. (*Id.* at 47.) When asked whether Officer Carter had an identification number, Agent Burmeister testified, "I don't know for a fact, but I don't think he did." (*Id.*) Agent Burmeister also testified that he did not ask Officer Carter if he had an identification number. (*Id.* at 47–48.)

there were any illegal drugs in the car. (*Id.* at 11:05–11:22.) Then Jamie Cruz admitted that there was a small bag of drugs in the vehicle, and Jorge Cruz stated that there was a pipe in the passenger door and a small bag of methamphetamine. (*Id.* at 11:05–11:50.) Upon searching the vehicle, Agent Burmeister located the pipe and methamphetamine. (*Id.* at 14:16–14:33.) He also found a trap compartment that contained cash and a large quantity of methamphetamine, heroin, and fentanyl. (*Id.*) Both Jamie Cruz and Jorge Cruz were arrested.

## II. LEGAL STANDARD

Congress passed 28 U.S.C. § 636(b) "to relieve some of the burden on the federal courts by permitting the assignment of certain district court duties to magistrates." *United States v. Curtis*, 237 F.3d 598, 602 (6th Cir. 2001). Pursuant to the provision, magistrate judges may hear and determine any pretrial matter pending before the Court, except various dispositive motions. 28 U.S.C. § 636(b)(1)(A). Regarding those excepted dispositive motions, magistrate judges may still hear and submit to the district court proposed findings of fact and recommendations for disposition. 28 U.S.C. § 636(b)(1)(B). Upon hearing a pending matter, "[T]he magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed. R. Civ. P. 72(b)(1); *see also Baker v. Peterson*, 67 F. App'x 308, 310 (6th Cir. 2003). Any party who disagrees with a magistrate's proposed findings and recommendation may file written objections to the report and recommendation. Fed. R. Civ. P. 72(b)(2).

"The standard of review that is applied by the district court depends on the nature of the matter considered by the magistrate judge." *See Baker*, 67 F. App'x at 310 (citations omitted) ("A district court normally applies a 'clearly erroneous or contrary to law' standard of review for nondispositive preliminary measures. A district court must review dispositive motions under the *de novo* standard."). Motions to suppress evidence are among the motions in criminal cases that

are subject to *de novo* review. *See* 28 U.S.C. § 636 (b)(1)(A); *U.S. Fid. & Guarantee Co. v. Thomas Solvent Co.,* 955 F.2d 1085, 1088 (6th Cir. 1992). "A district court should only review for clear error where a party makes perfunctory arguments to engage the district court in rehashing the same arguments set forth in the original petition." *Brooks v. Invista (Koch Indus.*), 528 F.Supp.2d 785, 788 (E.D. Tenn. 2007). Upon review of the evidence, the district court may accept, reject, or modify the proposed findings or recommendations of the magistrate judge. *Brown v. Bd. of Educ.*, 47 F. Supp. 3d 665, 674 (W.D. Tenn. 2014); *see also* 28 U.S.C. § 636(b)(1). The court "may also receive further evidence or recommit the matter to the [m]agistrate [j]udge with instructions." *Moses v. Gardner*, No. 2:14-cv-2706-SHL-dkv, 2015 WL 1064781, at *1 (W.D. Tenn. Mar. 11, 2015). A district judge should adopt the findings and rulings of the magistrate judge to which no specific objection is filed. *Brown*, 47 F. Supp. 3d at 674. The district court is not required to review "a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III.   ANALYSIS

As a preliminary matter, the Chief Magistrate Judge found that Defendant Jorge Cruz had passenger "standing" under the Fourth Amendment to challenge the traffic stop and subsequent search.[6] (ECF No. 88, 10.) The parties did not object to this finding. The parties also voice no objection to the Magistrate Judge's finding that there was probable cause to support Agent Burmeister's initial traffic stop.[7] (ECF No. 96, 2.) The remaining issues are whether Agent

---

[6] In its Response to the Motion to Suppress, the Government argued that Defendant Jorge Cruz failed to demonstrate standing. (ECF No. 52, 3.) But the Government did not raise any such objection in its Response to the R&R.

[7] The initial stop was properly based on Agent Burmeister's observation of Jamie Cruz's traffic violation. (ECF No. 1, 2.) Since this traffic violation was "complete" when the Defendant's car was pulled over, the probable cause standard applies. *See United States v. Jeffries*, 457 F. App'x 471, 477 (6th Cir. 2012). Here, there was a sufficient basis for Agent Burmeister to effectuate a traffic stop to issue a warning for the violation.

6

Burmeister impermissibly extended the duration of the stop to conduct unrelated inquiries, which ultimately included use of the drug dog, and whether he had reasonable suspicion to do so. As explained below, the Court finds that the encounter was impermissibly extended, and no articulated reasonable suspicion of criminal activity existed.

In the R&R, the Chief Magistrate Judge concluded that Agent Burmeister's actions after he finished filling out the warning ticket form were clearly unrelated to the stop's purpose, which impermissibly extended the duration of the encounter. (ECF No. 88, 14.) These actions included questioning Jamie Cruz about the presence of drugs, weapons, currency, and hidden compartments, asking for consent to a search, and when consent was denied, calling for and waiting for the arrival of the drug dog and its alert on the vehicle. The Government objects by arguing that the stop's purpose was still ongoing because the officers were still waiting on the records check from BLOC when Agent Burmeister asked those questions and Agent Burton obtained the alert from the dog. (ECF No. 96, 9.) The Government also argues that what Agent Burmeister learned during the permissible part of the encounter gave him independent reasonable suspicion to prolong the stop and wait for the arrival of the drug dog. These facts, the Government says, include Jamie Cruz's description of his travel itinerary, unemployment status and his body language and nervous demeanor. (*Id.*) The Court addresses each of the Government's arguments individually and collectively.

A. **Whether the stop's duration was impermissibly extended**

The Fourth Amendment protects "people" from unreasonable searches and seizures. U.S. Const. amend. IV. However, officers may stop a vehicle when they have probable cause to believe a traffic violation was committed, or where the stop is supported by reasonable suspicion that criminal activity is ongoing or about to occur. *United States v. Collazo*, 818 F.3d 247, 253–54 (6th

7

Cir. 2016). Once a traffic stop has been made, the ensuing encounter must be limited in both scope and duration by its purpose or mission—to address the traffic violation that warranted the stop, and any related safety concerns. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (internal citations omitted). The mission of the stop includes not only deciding whether to issue a ticket, but also taking actions ordinarily associated with the stop like checking the driver for license and identification, verifying registration and proof of insurance, checking for any outstanding warrants on the vehicles' occupants, and asking context-framing questions relating to travel plans or the driver's authority to operate the vehicle. *See Rodriguez*, 575 U.S. at 355; *Collazo*, 818 F.3d at 258; *United States v. Whitley*, 34 F. 4th 522, 529 (6th Cir. 2022). However, officers' actions that are aimed at detecting evidence of criminal wrongdoing "lack the close connection to roadway safety and are not fairly characterized as part of the officer's traffic mission." *Whitley*, 34 F. 4th at 529 (citing *Rodriguez*, 575 U.S. at 354–55). Authority for the stop ends when tasks tied to the traffic violation are—or reasonably should have been—completed. *Rodriguez*, 575 U.S. at 354; *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020); *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005).

In *Rodriguez*, the Supreme Court held that prolonging a traffic stop without reasonable suspicion of criminal activity, to conduct a dog sniff, violates the Fourth Amendment. 575 U.S. at 357–58. In doing so, the Court emphasized that "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff "prolongs"—i.e., adds time to—"the stop."" *Id.* at 357. In *United States v. Hayes*¸ the District Judge agreed with the Magistrate Judge and found that the stop should have concluded in no more than six (6) minutes, the time it took the officer to obtain all the information necessary to complete the warning citation and receive records information back from the dispatcher. 458 F.Supp.3d.

857, 868 (E.D. Tenn. Apr. 28, 2020). The District Court concluded that during those six (6) minutes, the officer did not learn anything that supported reasonable suspicion of criminal activity sufficient to prolong the stop and ask unrelated investigatory questions and conduct a dog sniff. *Id.*

The Government objects to the R&R's reliance on *Hayes* and attempts to distinguish it from the instant facts by asserting that the bulk of the questioning during the fifteen-minutes leading up to the alert by the drug dog in *Hayes* was not pertinent to the stop, officer safety, or the defendant's travel plans. (ECF No. 96, 4.) The Government argues that Agent Burmeister's questioning largely concerned Jamie Cruz's travel plans, which the Sixth Circuit recognized is part of the mission of a traffic stop. (*Id.* (citing *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023)) The Government's point is well-taken. However, the instant facts are more like those in *Hayes*. Here, Agent Burmeister chose not contact BLOC after his initial questioning of Cruz, or while he was filling out the warning ticket. Thus, the stop should have concluded when he finished asking his initial questions of Cruz and completed filling out warning ticket. The subsequent questioning about contraband, consent to search the vehicle, and calling for the drug dog were separate and unrelated to the stop's mission. These unrelated inquiries and actions unreasonably prolonged the duration of the stop and violated *Rodriguez*. The sequencing of Agent Burmeister's conduct runs afoul because he deviated from the stop's purpose and mission. He was not awaiting the records check information when he first questioned Cruz about contents of the car and called for the drug dog. Agent Burmeister called into BLOC after he asked Cruz the drug related questions, was denied consent to search, and called for the drug dog.

The Government also objects to the R&R's partial reliance on a Second Circuit District Court decision. (*See United States v. Parks*, Nos. 19-CR-87-LJV-JJM, 20-CR-69-LJV-JJM, 2022

9

WL 1819383, at *1 (W.D.N.Y. June 3, 2022)). (ECF No. 96, 4, 5.) The Government states that the Chief Magistrate Judge's reliance on *Parks* is inconsistent with Sixth Circuit binding case law. (ECF No. 96, 4.) However, as the Magistrate Judge noted, *Parks* is persuasive because the critical issue is whether an officer's asking unrelated questions extends the stop in violation of *Rodriguez*. (ECF No. 88, 23-24.) As explained earlier, Agent Burmeister's asking questions about drugs, weapons, hidden compartments, currency, consent to a search, and his call for a drug dog were clearly unrelated to the mission of the stop. This conduct extended the stop beyond the time required to deal with the traffic stop and violated *Rodriguez*.

The Government's argument that the stop was still ongoing is without merit. Agent Burmeister testified that the stop was not complete at about 6 minutes and 30 seconds into the encounter, when the traffic form was filed out because he had not yet run a records check with BLOC. (ECF No. 89, 32.) Yet, he testified that he contacted BLOC at about 8 minutes and 20 seconds, after spending at least two minutes asking Jamie Cruz drug investigation related questions, asking for consent to search, and then calling for a drug dog after consent to search was refused. In this instance, delaying making the call BLOC cannot justify extending the traffic encounter because the call to BLOC occurred after Agent Burmeister's drug related inquiry of Cruz. The Court agrees with the Chief Magistrate Judge's finding that the stop concluded when the form was completed and the officer approached Cruz with it, even though it was not physically given to Cruz. Thus, Agent Burmeister's approximate two-minute variance from the purpose of the traffic stop unreasonably prolonged the encounter. (ECF No. 88, 25.)

## B. Whether there was independent reasonable suspicion to justify the stop's extension

The Sixth Circuit has adopted the bright-line rule from *Rodriguez* that any extension of a traffic stop absent independent reasonable suspicion is improper. *See Hernandez*, 949 F.3d at 256; *see also Davis*, 430 F.3d at 353. Thus, to continue detaining the Cruzes beyond the time that was necessary to complete his inquiry into the traffic violation, including preparation of the warning ticket form, Agent Burmeister needed reasonable suspicion of wrongdoing (other than the traffic violation) that arose during the stop.[8] *See United States v. Taylor*, 121 F.4th 590, 595 (6th Cir. 2024). Without such reasonable suspicion, Agent Burmeister's actions unrelated to scope of the original mission impinged on the Fourth Amendment rights of the Cruzes. *See United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).

To determine whether there is reasonable suspicion, courts consider the totality of the circumstances, and view the evidence "using a common-sense approach, as understood by those in the field of law enforcement," giving due weight to the officer's experience and specialized training. *Collazo*, 818 F.3d at 257 (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)); *United States v.* Williams, 68 F.4th 304, 308 (6th Cir. 2023). But even an experienced officer must point to specific and articulable facts supporting his suspicion. *Collazo*, 818 F.3d at 257. In analyzing these facts, the Court cannot use a "divide-and-conquer" approach by reviewing each factor in isolation from the other factors. *Taylor*, 121 F.4th at 595 (citing *United States v. Arvizu*, 543 U.S. 266, 274 (2002)). Still, the Court must examine the factors in order, which

---

[8] As noted above, Agent Burmeister testified that he contacted BLOC after spending at least two minutes asking Jamie Cruz drug investigation related questions, asking for consent to search, and then calling for a drug dog after consent to search was refused.

involves "a brief discussion of each factor and its weight in the analysis." *Id.* at 595 (quoting *United v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001)).

The Government contends that the officer developed reasonable suspicion during the permissible portion of the stop. Agent Burmeister had concerns about Jamie Cruz's travel itinerary, his unemployment status, and his body language and nervous demeanor. The Court considers these facts as articulated, and finds that even viewed collectively they are insufficient to give rise to reasonable suspicion.

### i. Jamie Cruz's travel itinerary

In the reasonable-suspicion analysis, the Sixth Circuit has afforded significant weight to conflicting or implausible explanations of travel plans. *Id.* at 595 (citing *Williams*, 68 F.4th at 308); *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002)). Here, Agent Burmeister thought Jamie Cruz's travel plans were "odd" because Cruz offered no specific destination initially and there was no planned itinerary for such a long road trip. (ECF No. 89, 66–67.) According to Agent Burmeister, he "got three different answers" and a "delay in speech" from Jamie Cruz when asked about his travel itinerary: first that he and his brother were just visiting, second that they were just driving around, and third that they were visiting the city based on a recommendation from his "daughter's cousin's dad." Agent Burmeister states that these facts aroused his suspicions. (ECF No. 89, 56–57.)

But viewing the Bodycam video, the Court agrees with the Magistrate Judge that Cruz's first and second answers were given within seconds of each other, and the third answer was given in response to Agent Burmeister's additional question. (*See* Ex. No. 1, Burmeister Video.) Viewed collectively, Jamie Cruz and his brother were visiting and driving around Indianapolis, especially

12

to see "Lucas Stadium" on the recommendation of a relative. This description is not so implausible as to be given considerable weight in the reasonable-suspicion analysis. *See Williams*, 68 F.4th at 308 (finding that the defendant's travel plans were a weighty factor in establishing reasonable suspicion where the vacation could only have lasted several hours, he was "several hours off the most direct route," he offered no information about their specific plans, and he was on probation and would have been subject to travel restrictions). Moreover, Jamie Cruz provided a destination to his travel plans—a round trip from Dallas to Indianapolis; Agent Burmeister's testimony shows his awareness of this fact. (ECF No. 89, 38.) Given the failure of the officer to pursue further questioning, such as by asking questions of co-passenger Jorge Cruz, there were no inconsistencies to discredit Jamie Cruz's travel itinerary that would support reasonable suspicion of illegal activity. *See Taylor*, 121 F.4th at 596. Finally, the Court addresses Jamie Cruz's description of the relative as his "daughter's cousin's dad." Although the reference was unusual, there is nothing inherently suspicious about referring to your relationship with an individual with that way. Standing alone, Jamie Cruz's answers to Agent Burmeister's about his travel plans and contact with family contribute little to having reasonable-suspicion of criminal activity.

### ii. Jamie Cruz's employment status

Next, the Court considers the significance of Jamie Cruz's unemployment. Agent Burmeister seemed to be suspicious about Cruz making a weekend trip, which included a 26-hour round trip drive, from Dallas to Indianapolis while he was unemployed. (ECF No. 89, 38–39.) Specifically, Agent Burmeister said, "if he doesn't have a job and there's no source of income, what's paying this trip? Criminal activity? What's going on here?" (*Id.* at 39.) Yet, as the Magistrate Judge correctly noted, Agent Burmeister did not ask any follow-up questions about how Jamie Cruz was funding the trip, such as whether he was paying with his savings or his brother Jamie

13

Cruz's income. (ECF No. 89, 59.) Agent Burmeister further testified that he found it suspicious that Jamie Cruz volunteered his employment status to a police officer.[9] (ECF No. 89, 61.) But that fact lends support to the opposite inference; Cruz had no reason to hide his lack of employment. Thus, his employment status combined with his travel itinerary does not amount to reasonable suspicion of criminal activity. This conclusion is also bolstered by the fact that Agent Burmeister did not make the BLOC inquiry after questioning Cruz about his travel plans, family contacts, and unemployment status.

### iii. Jamie Cruz's body language and nervous demeanor when asked about contraband in his vehicle.

Nervousness is "an unreliable indicator, especially in the context of a traffic stop. *Richardson*, 385 F.3d at 630. Thus, Agent Burmeister's observation of Cruz's nervous demeanor cannot reasonably support his suspicion of criminal activity because any nervousness Cruz displayed was in response to questioning about contraband in the vehicle. *See Alderson*, 2022 WL 3356025, at *4. This questioning itself was impermissible as it was beyond the stop's permissible duration and mission. Even then, the indicators that Agent Burmeister identified—Cruz's "nodding" and "dead serious" face- were so minute in the video that the Court cannot assign any meaningful significance to them. (*See* Ex. 1, Burmeister Video.)

The indicators that the Government relies on to advocate Agent Burmeister's reasonable suspicion determination—travel plans, unemployment status and nervous demeanor—are, at best, weak. Taken together, these facts are still insufficient to support a finding of reasonable suspicion of criminal activity to prolong the traffic stop. It appears to this Court that what Agent Burmeister observed was an individual that recently lost his job, and was taking a round trip with his brother

---

[9] The Court notes that Cruz offered this fact in response to Agent Burmeister's inquiry about his travel plans. (Ex. No. 1, Burmeister Video, 2:53–3:05.)

to Indianapolis to visit sites on the recommendation of a relative. The Court recognizes the threshold for reasonable suspicion is lower than probable cause; yet it cannot be based on facts that only give an officer a "hunch" or "gut feeling" that something is amiss. *Williams*, 68 F.4th at 308.

Under the totality of the circumstances and viewing all facts together and in the light most favorable to the Government,[10] Agent Burmeister lacked a reasonable, articulable suspicion of criminal activity that would justify extending the stop to conduct a dog sniff. Because the dog alert was impermissible, so was the search of the vehicle. In this case, the Fourth Amendment bars admission of the evidence that was found pursuant to the search of the car, and it is therefore **SUPPRESSED**.

### IV.     CONCLUSION

After a *de novo* review, the Court hereby **ADOPTS** the Magistrate Judge's Report and Recommendation and **GRANTS** Defendants' Motions to Suppress evidence.

**IT IS SO ORDERED** this 16th day of January, 2025.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
UNITED STATES DISTRICT JUDGE

---

[10] On December 18, 2024, the Government filed a notice of new case law. (ECF No. 106.) (*See United States v. Urraca*, 123 F.4th 834 (6th Cir. 2024)). The Government argues that the Sixth Circuit's totality-of-the-circumstances analysis in *Urraca* as it relates to the defendant's nervousness and travel itinerary strengthens their objections to the R&R. In *Urraca*, the Sixth differentiates between the inevitable "baseline anxiety" experienced by anyone stopped by the police versus the complete "change in demeanor—from candid and calm to nervy and evasive in response" to police's questions. *Id.* at 839. While the Sixth Circuit found the latter in *Urraca*, Jamie Cruz's nervousness here was of the former type. Even then, as mentioned before, it was elicited by Agent Burmeister's questioning about contraband after the mission of the stop was already concluded. With regard to inconsistent or strange explanations for travel plans, nothing of the sort occurred or is addressed by the Sixth Circuit in its decision.